## BARKET & ANGELI, P.C.

*Attorneys at Law*

666 OLD COUNTRY ROAD
SUITE 600
GARDEN CITY, NEW YORK 11530

(516) 745-0101
FAX (516) 745-0596
E-MAIL: bbarket@barketangeli.com

BRUCE A. BARKET
TONI MARIE ANGELI

August 21, 2008

The Honorable Robert R. Patterson
Senior United States District Judge
Southern District of New York

New York, New York 10013

**Re:    United States v. Rafael Barrios**
        **Indictment No. 01511-2007**

Dear Judge Patterson:

Please accept this letter memorandum submitted on behalf of my client, Rafael Barrios, who is scheduled for sentencing before Your Honor on Monday, August 25, 2008, at 2:00 p.m.

### PROCEDURAL HISTORY

On March 30, 2007, Mr. Barrios was arrested by three New York City police officers who witnessed Mr. Barrios, along with three other men, standing on the sidewalk next to a Chrysler parked on Prospect Street in the Bronx, New York. According to law enforcement, the officers observed the men holding cups in their hands and, suspecting violations of the prohibition against drinking alcohol from an

open container, approached to investigate. Upon approaching the men, Officer William O'Donnell testified that the defendant was observed tossing what may have been a handgun underneath the Chrysler and, at that point, Mr. Barrios was placed under arrest.

Subsequent to Mr. Barrios' arrest, a handgun was recovered from underneath the Chrysler. Mr. Barrios was brought to the precinct for processing, and subsequently the Chrysler, which was registered to Mr. Barrios, was searched and seized. Narcotics and other physical evidence were recovered from inside the trunk of the vehicle. As the trial testimony made apparent, law enforcement did not observe Mr. Barrios, or any of the individuals standing with him next to the Chrysler, inside the vehicle nor accessing the trunk to the Chrysler at any time.

Mr. Barrios was held in state custody until he was arrested by federal agents on April 27, 2007. On or about July 19, 2007, a grand jury for the Eastern District of New York issued a two-count Indictment charging the following: <u>Count One</u>, that the defendant unlawfully, intentionally and knowingly possessed with the intent to distribute a controlled substance in violation of Title 21, United States Code, § 812, 841 (a)(1) and 841 (b)(1)(C), a class C felony, and, <u>Count Two</u>, that the defendant employed a firearm to facilitate the crime of drug trafficking in violation of Title 18, United States Code, § 924 (c)(1), a class A felony.

Hearings were conducted on the matter on October 25, 2007. The hearing Court disagreed with the defense position that (1) permitting law enforcement to locate property, take it into custody and thereafter search it, under the guise of "safe-guarding" property that was not in its custody in the first place,

runs afoul of Fourth Amendment protections, and (2) that the government failed to meet their burden to establish law enforcement conducted an "inventory search" as such has been defined and articulated by the New York State Court of Appeals.

During pre-trial negotiations, the government indicated that they would recommend a period of five years incarceration upon a plea of guilty to both counts of the indictment. The defendant opted to exercise his constitutional right to a trial by jury.

The initial trial on this matter commenced on November 27, 2007. After a period of deliberations, on November 29, 2007, the jury announced that it was unable to reach a unanimous verdict, and a mistrial was declared.

After the mistrial, the Court entertained and thereafter granted Mr. Barrios' application for bail. On December 21, 2007, Mr. Barrios was released on a $200,000 bond, secured by the family home, located at 3 Adams Circle in Hammonton, New Jersey. Upon release from Federal custody, Mr. Barrios was subject to strict supervision, including weekly substance abuse testing, an early curfew, travel restrictions and electronic monitoring. Rafael Barrios was compliant with each and every term and condition of his pre-trial release. Further, although Mr. Barrios resides with his family in Hammonton, New Jersey, some 4 hours from New York City, Mr. Barrios and his family responded faithfully, diligently and dutifully to appear as directed by the Court.

Page 4
August 21, 2008
Honorable Robert Patterson

The second trial on this matter commenced on February 25, 2008. On February 29, 2009, after a period of deliberations, the jury reached a verdict of guilty on both counts. At that time, Mr. Barrios was remanded back into the custody of the Federal Bureau of Prisons. As documented in the PSR prepared by the department of probation, there are no disciplinary records for Mr. Barrios during his incarceration.

A pre-sentence investigation was conducted by United States Department of Probation. According to the terms of the pre-sentence report, Mr. Barrios faces an advisory guideline range of 51 to 63 months imprisonment on Count One, followed by the mandatory 60 month consecutive term of imprisonment on Count Two.

While the defense recognizes the serious nature and consequences of the crimes for which Mr. Barrios stands convicted, it is our hope, shared by Rafael and his family, that this Court will give due consideration to factors that support imposing a sentence that is "sufficient, but not greater than necessary". As supported by the letters from family and friends, as well as other documentary submissions, the defense seeks to demonstrate to this Court that Rafael is a young man with immense potential to live as a contributing, valuable and highly functioning member of society. It is notable that Mr. Barrios comes from a loving, supportive family with a strong work ethic. Prior to his arrest on this matter, Mr. Barrios was gainfully employed, steadily, since 16 years of age. It is our hope that in the near future, Rafael will be able to rejoin his loving family, re-integrate back into society, and embark on building a positive, constructive and beneficial future.

Page 5
August 21, 2008
Honorable Robert Patterson

## GOVERNING LEGAL PRINCIPLES

In United States v. Booker, 543 U.S. 220 (2005), the United States Supreme Court rendered the United States Sentencing Guidelines advisory. The Second Circuit has instructed that, although advisory, the sentencing court must still calculate the appropriate sentencing range under the guidelines, including any departure provisions. United States v. Crosby, 397 F.3d 103 (2d Cir. 2005). Once an applicable guideline range has been determined, the sentencing judge will have the duty, imposed by section 335(a)(4), to "'consider' it, along with all of the factors listed in section 3553 (a)." This Court must give due consideration to the factors identified in 18 U.S.C. § 3553(a), in order to impose a sentence "sufficient, but not greater than necessary." These factors are as follows:

(1)    the nature and circumstances of the offense and the history and characteristics of the defendant;

(2)    the need for the sentence imposed –

    (A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    (B)    to afford adequate deterrence to criminal conduct;

    (C)    to protect the public from further crimes of the defendant; and

    (D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3)    the kinds of sentences available;

(4)    the kinds of sentence and the sentencing range established [by the Sentencing Guidelines] . . .;

(5)    any pertinent policy statement — . . . ;

(6)    the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7)    the need to provide restitution to any victims of the offense.

After reviewing all of the section 3553(a) factors, it is the defense hope that this Court will find that a period of six months imprisonment on Count One, followed by the mandatory term of 60 months

consecutive on Count Two, is a sufficient period of incarceration.

## PERSONAL HISTORY

Twenty-eight year old Rafael Barrios is the youngest of two children who come from an extremely connected and supportive family. The Barrios family in many ways exemplify American ideals, the family is tightly knit and connected through the generations, the parents worked hard, saved their money, and were able to purchase a home, close to other members of their extended family. Rafael's father and mother have exemplified the value of hard-work as both worked steadily throughout Mr. Barrios upbringing. His father worked for over twenty-five years at Atlantic City Medical Center, and his mother, who is now medically retired due to Myasthenia Gravis disease, worked for over twenty years at the Trump casino in Atlantic City. Although Rafael's parents separated over a decade ago, his parents have maintained a caring and amicable relationship and presented a united support system throughout all stages of the pre-trial proceedings and the two trials that were litigated before Your Honor.

Both Rafael and his older sister have followed in their parent's footsteps in adopting a healthy work ethic, strong commitment to their familial relationships, and productive lives. Rafael's 30 year-old sister Tanya Barrios also was present, her work schedule allowing, throughout the two trials litigated before this Court. At the time of the trial, Ms. Tanya Barrios was attending Richard Stockton College in New Jersey, working as a neo-natal nurse at Atlantic City Medical Center, and expecting her first

Page 7
August 21, 2008
Honorable Robert Patterson

child. Since that time, Ms. Barrios has had a son, Rafael's nephew Chase, and remains an ardent

source of love, support and guidance for Rafael.

## RAFAEL IS A CONTRIBUTING AND PRODUCTIVE MEMBER OF SOCIETY

Rafael, a young man who has been gainfully employed since 16 years of age, has consistently

demonstrated his ability and desire to contribute as a productive member of society. At the time of his

arrest, Rafael had been working for two years, and was a valued employee, with Randazzo

Construction (See Exhibit A, Letter from Joseph Randazzo, Jr.). Moreover, Rafael has been steadily

and gainfully employed since the time he was in high school. (See Exhibit B, Diploma from Oakcrest

High School). Further, Rafael has demonstrated his openness to pursuing productive avenues to bring

positive benefits to himself and the society he lives in, such as obtaining a vocational training (See

Exhibit C, Certificate from Atlantic County Vocational School in Pastry Baking) and the numerous

community service projects he voluntarily participated in (See Exhibit D, Letter from Lambda Theta Phi

Latin regarding volunteer work for the Cystic Fibrosis Fund and Support for Victims of Hurricane

Katrina; Exhibit E, Letter from Police Officer Melvin Murray regarding volunteer work as a Peer

Athletic Advisor in the Venice Park Afterschool Basketball League).

While Rafael is now incarcerated, at the time of his conviction he was working full-time at

Randazzo Construction and simultaneously worked intermittently with AWL Construction. Defense

counsel's conversations with Rafael's family, friends and co-workers has established, to a person, that

Page 8
August 21, 2008
Honorable Robert Patterson

Rafael is a respectful, hardworking and well liked young man. The fact that Rafael, a young man with such potential, who has a demonstrable desire to positively contribute to society, and who was headed stalwartly in the right direction, became connected to narcotics and criminal activity, is a not only a monumental source of disappointment and loss to the Barrios family, but to society in general.

## ATTESTATIONS OF RAFAEL BARRIOS' CHARACTER AND ABILITY TO BE A LAW ABIDING CITIZEN

Collectively attached hereto as "Exhibit G" are additional letters written by Rafael Barrios' family and friends. These letters capture Mr. Barrios' character, his giving nature, and the strong ethics and values of the people who support him. It is notable that two of the letters of support come from members of law enforcement, one from Detective Danny Adcock, who has known Rafael for 25 years, and one from Police Officer Melvin Murray, Jr., with whom Rafael volunteered in a community after-school program  The defense found that Mr. Barrios' arrest, connection to criminal activity and involvement in the criminal justice system was a great source of surprise and disappointment for those close to him. Although Rafael's involvement in the criminal justice system has been shocking, challenging, and at times heart-breaking, for Rafael and his family, they have expressed their continued belief in Rafael's future potential and remain committed to working together to support him in building a positive and rewarding future.

Page 9
August 21, 2008
Honorable Robert Patterson

Throughout this situation it has been more than apparent that the supportive relationship that exists between Rafael and his extended family and his co-workers and his friends remains intact, as evidence by their steadfast belief in Rafael's potential, frequent telephone calls of concern to our law office, and the letters of support which are collectively attached here.

## RAFAEL BARRIOS IS UNABLE TO PAY A FINE

As confirmed by the department of probation in their PSR, Rafael Barrios does not have a current source of income. Further, an Equifax credit report generated by the department of probation confirmed that Mr. Barrios owes $250 toward an HSBC Bank charge account, $705 toward a Washington Mutual charge account, $533 owed to an account with Verizon, and $24,693 owed on an outstanding loan on the Chrysler seized and forfeited attendant to his arrest. Additionally, while Mr. Barrios was gainfully employed at the time of his arrest, he was earning a modest wage of $15.00 per hour. As such, the defense asserts that the defendant does not have the present or prospective ability to pay a fine of any significance, and respectfully requests that this Court not impose a fine.

## REQUEST FOR COURT DIRECTIVE FOR INCARCERATION IN NEW JERSEY

The defense further requests that this Court order that Rafael be housed in a New Jersey facility in order to facilitate continued connection with the family that stands ready to provide him with support, encouragement and guidance up until the time of his release. In support of this request, the defense brings to the Court's attention the fact that Mr. Barrios' mother, Frances Barrios, suffers from

Page 10
August 21, 2008
Honorable Robert Patterson

Myasthenci Gravis Disease. (See Exhibit H). Frequently, and to varying degrees, the disease renders

Ms. Barrios immobilized. At such times it will be most onerous, if not impossible, for Ms. Barrios to

travel a great distance to visit her son. As such, it would be a great consolation to the Barrios family to

have Rafael housed as close as possible to the family home in Hammonton, New Jersey.

## CONCLUSION

The defense is hopeful that a review of this young man's personal history, work history,

family connectedness, and his lack of significant contact with the criminal justice system will lead this

Court to conclude that, while a period of incarceration is required under the law, societal and

penalogical objectives are best served by Rafael's timely return to the positive support systems that

exist within his extended family and community. The defense believes that such a determination

recognizes that Rafael Barrios is a young man with the capacity to learn from this situation, an individual

who has previously demonstrated a desire to be a positive and contributing member of society, and a

person who has the potential to move forward to create a positive and productive future. As well

stated in the letter of to the Court here submitted on behalf of Rafael's cousin, Louis Barrios (Exhibit F):

"Rafael has the foundation to become a productive member of society
given the opportunity. We all fear the effects that a long term sentence
would have on Rafael. In conversations I have had with him I know he
has grown from this experience and as unconventional as it sounds, I
believe he has become a better person for realizing what is important to
him as a man. He is a good young man with his entire life ahead of him.
I ask the court to please have compassion in your sentencing of Rafael
Barrios Jr."

Page 11
August 21, 2008
Honorable Robert Patterson

The defense is hopeful that after review, this Court will conclude that such leniency is appropriate. It is the desire of all close to Rafael Barrios to see to it that the poor choices and detrimental circumstances he embroiled himself in, become a part of his past, and to support him as he embarks on creating a positive future.

On behalf of Rafael Barrios and his friends and family, the defense thanks you for your thoughtful consideration in sentencing Mr. Barrios.

Sincerely yours,

Toni Marie Angeli
(516) 745-0101

# RANDAZZO CONSTRUCTION

To Whom It May Concern:

The purpose of this letter is to inform you that Rafael Barrios Jr. has been an employee of my company for the past two years and is an absolute asset to my company. He is very punctual and has excellent work habits. He is great in leading projects and is always eager to learn new things. I have had many people come through my company over the years and the qualities that Rafael have are very hard to find in the field today. Rafael was earning $15.00 per hour during his employment. He will always have a place to work as long as I am in business. Please feel free to contact me directly with any questions or concerns (609) 839-4960. Thank you.

Sincerely,

Joseph Randazzo Jr.

126 Pratt Street
Hammonton, NJ 08037

PHONE   (609) 839-4960
FAX     (609) 567-4239
E-MAIL  razthree@msn.com

# Oakcrest High School



This certifies that

## Rafael Barrios Jr.

has satisfactorily fulfilled the requirements for graduation from the Oakcrest High School as prescribed by the Board of Education of the Greater Egg Harbor Regional High School District and is entitled to this

## Diploma

Awarded this month of June, 1999.

Walt I. Vernon
President, Board of Education

Norm N. Knoll
Secretary, Board of Education

John C. Offer
Superintendent

Dennis Freeman Ed.D.
Principal

# ATLANTIC COUNTY
## VOCATIONAL TECHNICAL SCHOOL
### MAYS LANDING, NEW JERSEY

THIS IS TO CERTIFY THAT

## RAFAEL BARRIOS, JR.

HAS SATISFACTORILY COMPLETED THE CURRICULUM IN

## PASTRY BAKING

PRESCRIBED BY THE VOCATIONAL SCHOOL IN THIS COUNTY OF ATLANTIC,
STATE OF NEW JERSEY
IN RECOGNITION THEREOF THIS

## CERTIFICATE

IS GIVEN IN THE MONTH OF JUNE, 1999

_____
PRESIDENT, BOARD OF EDUCATION

_____
SECRETARY, BOARD OF EDUCATION

_____
SUPERINTENDENT

_____
PRINCIPAL



**Lambda Theta Phi Latin Fraternity Incorporated**
**Lambda Gamma Chapter of Southern New Jersey**

Phone: 856.882.1123    Fax: 856.784.1094

April 15, 2007

Re: Rafael Barrios Jr.

To Whom It May Concern:

Please accept the following letter as a testament on behalf of Rafael Barrios Jr. I have had the opportunity and pleasure in working with Mr. Barrios in several community service projects sponsored by Lambda Theta Phi along with fund raising initiatives co-sponsored by Lambda Theta Phi and Intercounty Mortgage Network of New Jersey.

Mr. Barrios has been instrumental in the organization of our Chapters efforts in community service initiatives in raising monetary funding, food, and resources for the Hurricane Katrina victims when the initial disaster struck. The paramount need and broad reach of implications spurned by the natural disaster exhausted our Fraternity's resources and foundation man power. Mr. Barrios took the initiative to mobilize local depots in collecting needed resources which were ultimately delivered to a larger non-profit organization.

In May of 2006 Mr. Barrios assisted Lambda Theta Phi and Intercounty Mortgage with a co-sponsored fund raising event for Cystic Fibrosis. His participation in the Sixty Five Roses Sports Gala allowed the hosting organizations to solicit donations and products that were used in an auction. The contributions from Mr. Barrios' efforts aided the sponsoring organizations in raising over $25,000.00 for research and support purposes in fighting the deadly disease.

Please consider this letter as a recommendation of character and integrity amidst the serious consequences that Mr. Barrios is facing. Although the purpose of this letter does not want to undermine the seriousness of the incident, I hope it provides a glimpse into the content of a young man's character and his contributions to his community, family, and friends. We hope the recognition and thankfulness of our organization helps Rafael to see his importance to us and those he has helped in tandem with providing a foundation of discretion to be considered by the criminal justice system he is currently detained in. Please do not hesitate to speak with me directly with any questions or concerns you may have.

Sincerely,

Joshua M. Fleig

Director of Alumni Affairs



-OPERATIONS COMMAND-
PATROL DIVISION

**MELVIN MURRAY, JR.**
*Police Officer K-9 Handler*

Dept. of Public Safety
2715 Atlantic Ave
Atlantic City, NJ 08401

(609) 347-5780 Communications
(609) 347-5588 Desk Sgt.
(609) 347-5766 Investigations

Thursday, July 17, 2008

To:     State of New York
        Division of Criminal Justice

From:   Officer Melvin Murray, Jr.
        Police Officer #469
        Atlantic City Police Department

Re:     Rafael Barrios, Jr. - Character Reference

Dear Sir or Madame:

This letter is to offer a character reference for Mr. Rafael Barrios, Jr. I have been closely
acquainted with Mr. Barrios' family and Mr. Barrios personally. I have known Mr. Barrios' family for
thirty years and have known Mr. Barrios since birth. He graduated from Oakcrest High School, Hamilton
Township, NJ class of 1999. Mr. Barrios participated in High School Basketball, and later became a Peer
Athletic Advisor for the Venice Park Basketball, Atlantic City, NJ, of which I am the Assistant
Coordinator. I have always known Mr. Barrios to be of upstanding moral character, and a bright
individual. Mr. Barrios has a strong community and family base from which to pull. I believe if any
lenience is shown it will not be a wasted opportunity. It is also my belief that Mr. Barrios will learn from
this incident and not repeat this behavior. If you have any further questions in reference to this matter
please feel free to contact me at any of the below listed numbers.

Respectfully Submitted:

Officer Melvin Murray, Jr. #469
Police Officer
Atlantic City Police Department
Charlie Patrol Platoon

(609) 344-4878 hm
(609) 992-2631 cell
(609) 347-5780

Police Communications

Louis Barrios
2010 Airport Road
Hammonton, NJ 08037
August 21, 2008

Dear Honorable Robert Patterson:

I wanted to reach out to you directly in the case referencing, Rafael Barrios Jr. I am his cousin and have known Rafael for all of his life. The process that the entire family has experienced this past year with both trials and the time he has spent in the federal facility has been very difficult to endure and emotionally draining.

I appreciate your patience in dealing with two separate trials and listening to testimony after testimony arguing this case. You also heard plenty of statements regarding Rafael's character and background. Although the verdict of the second trial did not have the outcome the family was hoping for, we are still here supporting Rafael.

Please understand that Rafael comes from a strong family background with many people supporting him. By no means am I trying to disregard the severity of the charges he was found guilty of. I am asking the court to please have leniency in the sentencing of this case. With all of the influences in today's society it is very common for a young man to make mistakes or put himself in a situation that can have a less than positive outcome. Unfortunately, today's "hip hop society" influences has blurred the defined line between right and wrong and it takes situations as Rafael is going through to bring clarity to that defined line.

Rafael has the foundation to become a productive member of society given the opportunity. We all fear the effects that a long term sentence would have on Rafael. In conversations I have had with him I know he has grown from this experience and as unconventional as it sounds, I believe he has become a better person for realizing what is important to him as a man. He is a good young man with his entire life ahead of him. I ask the court to please have compassion in your sentencing of Rafael Barrios Jr. Thank you.

Sincerely,

Louis Barrios

Frances Barrios
4018 Adam Circle
Hammonton, NJ 08037

Honorable Robert P. Patterson,
United States District Court
Southern District of New York
500 Pearl Street, Room 2550
New York, New York 10007

Dear Honorable Judge Patterson,

I am writing this letter as a concerned mother. My son, Rafael Barrios (Docket No. 07-CR-658), will appear in your court room on July 18, 2008, for sentencing. Your honor please show clemency with my son when considering his sentence.

Rafael is a son, a brother and uncle to a new baby boy; he is a cousin and a great friend to many people. He comes from a big tight knit family full of love and support. My son still has many things to accomplish in life. He has never been married or fathered any children. Rafael is a young man who has a lot of potential. He is a high school graduate and he also received a certificate from a vocational school.

My son has a lot to offer life, and life has a lot to offer him.

At the time of his arrest, Rafael had no previous arrests or criminal background. My son was establishing a career in construction. He was a very hard worker and was dedicated to his job and his family. My son is a very lovable, respectful, reliable, responsible, caring and a thoughtful person. He is greatly missed by his family and friends. Your honor please show leniency towards my son's sentencing.

Sincerely,

Frances Barrios



DET. DAN ADCOCK

**PLEASANTVILLE POLICE DEPARTMENT**
*Knowledge - Courage - Integrity*

17 North First Street
Pleasantville, N.J. 08232
P.P.D. Case #

Telephone: (609) 641-6100
Fax: (609) 646-1595

April 17, 2007

To Whom It May Concern,

I have known the Barrios family for approximately 25 years. I first met RJ as he is affectionately called when he was about two years old. He is a well-rounded and well-mannered person who has never given his parents any trouble and has not been in any trouble with Law Enforcement. He was raised with respect for his family and himself. RJ currently finds himself in trouble with the law. I firmly believe that he made an incredibly bad decision that was probably more from being with the wrong kind of people as opposed to him doing this from his own volition. I have been in Law Enforcement myself for approximately eighteen years and I believe and know that good people sometimes make bad choices. I believe that if RJ were to be given a second chance that he would appreciate that fact and do everything he can to not make the same mistake. I am hoping that whoever has the final decision on what happens to RJ will consider what I have stated, that he is a good person who made a bad choice and deserves a second chance. I am confident if you see fit to give him that chance that you will not regret that decision. If I can be of any assistance in this matter please feel free to contact me.

Sincerely,

DSG. Danny Adcock
DSG. Danny Adcock

Blair A. Bergen, M.D., F.A.C.O.G., F.A.C.S
26 WILSON DRIVE, NORTHFIELD NJ 08225
(609) 383-9697

July 17, 2008

RE: Raphael Barrios, Jr.

Dear Honorable Judge Robert Patterson:

I have known Raphael Barrios, Jr. (RJ as he is known to us) for 20 years as well as his family. I know the family personal and professional. RJ has always been a respectful, hardworking, and caring child and now young adult. He has a very loving family and was raised with good values. RJ has never been in trouble until now.

As with most children today they get caught up with the wrong people and get into trouble and make mistakes. As a parent myself, peer pressure on our children leads them down the wrong path which leads them susceptible to making mistakes.

This young man has told me he made a grave mistake and is very sorry for the pain and financial strain he has placed on his loving family. We ask that this young man be given a second chance. We respectfully request your Honor that you be very lenient with RJ lets show RJ that he is not only cared for by his family and friends but also by mankind and society.

Thank you in advance for your consideration.

Respectfully,

Blair A. Bergen, M.D., F.A.C.O.G., F.A.C.S.

**DAVID RODRIGUEZ**
**PLUMBING & HEATING**
Lic. No. 10811
6216 Mill Road, EHT
609-926-1008 or 609-576-4058

TO THE HONORABLE JUDGE ROBERT PATTERSON

My name is David Rodriguez, Sr. and I am writing on behalf of Ralph Barrios, Jr. I have been good friends of his parents and family for over 40 years. I witnessed Ralph Jr. growing up and he and my son, David Jr., are the best of friends.

Since I have known him he has never gotten himself into any trouble. I feel that he is in this situation solely on a misguided choice, something he did not fully think the consequences through. I believe that the prospect of serious jail time will undoubtedly serve to force him to re-evaluate his recent acquaintances and decisions.

In my experience with him he has exhibited a strong sense of character and a willingness to make his loved ones proud. I strongly feel he has reached a trying and confusing time in his life, but with the proper support can turn things around and truly become a law abiding and contributing member of his community.

I hope that with your wisdom and years of dealing with such young men that you may also see what this young man has to offer. I thank you for your time and consideration in this matter. If you require any further insight or information about Ralph Jr. please do not hesitate to call me at any time at 609-576-4058.

Sincerely,

David Rodriguez,
President
Rodriguez Plumbing & Heating

Honorable Judge Robert Patterson

    I am writing this letter on behalf of R. J. Barrios.

My name is George T. Reeves, and I have known Mr. Barrios for about 21 years.
I would just like to say Mr. Barrios is a bright and talented young man with a promising
future in his knowledge of carpentry along with his ability to learn.

Mr. Barrios also is a pleasure to have around, playing, social interacting with me and my
kids, explaining the importance of education.

    Although Mr. Barrios has been caught up in a bad situation I am asking for your leniency
on his sentencing.

    Mr. Barrios is a well mannered pleasure individual to have around.
I could go on about all the good in Mr. Barrios, but I now your time is limited.

Thank You for your time.
George T. Reeves

**DLD**
DIAGNOSTIKA GMBH

# Differential Diagnosis
## of Myasthenic Syndromes

## Acetylcholine Receptor Autoantibodies

### Diagnosis of *Myasthenia gravis*

Myasthenia gravis is an acquired, humoral autoimmune disease. Specific **acetylcholine receptor autoantibodies (ACHRAB)** lead to a reduced impulse transmission to the postsynaptic membrane of the neuromuscular end-plate.

T-helper cells which have been activated in the thymus probably stimulate the production of the acetylcholine receptor autoantibodies. These react mainly with the α-subunit of the receptors, reducing the functional activity at the postsynaptic membrane.

click the picture for better view



**Myasthenia gravis**
Autoantibodies against the postsynaptic acetylcholine receptor

## Calcium Channel Autoantibodies

### Diagnosis of *Lambert-Eaton Syndrome*

The primary physiological disorder in the Lambert-Eaton myasthenic syndrome (LEMS) is a reduced release of the neurotransmitter acetylcholine from the nerve terminals into the synaptic gap.

This presynaptic disorder is caused by autoantibodies against a membrane protein of the nerve cell, the voltage-gated calcium channel (VGCC). These channels are also described as active zone of the presynaptic membrane.

click the picture for better view



**Lambert-Eaton Syndrome**
Autoantibodies against the presynaptic voltage-gated calcium channels

## Clinical Features

The main features in myasthenia gravis are weakness and fatiguability of skeletal muscles. Ptosis and diplopia occur early in the majority of patients. Weakness remains localized to the

The Lambert-Eaton syndrome occurs less often than myasthenia gravis. The main characteristics are a weakness of the proximal muscles, reduced tendon reflexes as well as autonomous disorders like visual

Myasthenia Gravis

Page 2 of 4

extraocular and eyelid muscles in about 15 % of patients (ocular myasthenia). The facial and bulbar muscles can be affected (mild generalized disease). Generalized weakness develops in about 85 % of patients and can lead to a life-threatening impairment of respiration (severe generalized disease and crisis).

The disease occures during all ages, from infancy up to old age. The prevalence is 5-12 cases per 100,000 population. Women are affected twice as often as men.

In the severe generalized disease even low strain causes respiratory insufficiency. Sitting up as well as walking or standing is no longer possible without help. The limb muscells are almost immobilized. Chewing and swallowing may be strongly impaired and patients may aspirate. Because of these life-threatening conditions it can be necessary to look after the patients in an intensive care unit.

Patients with an initially severe generalized myasthenia gravis have a poor prognosis. Sometimes a myasthenic crisis with respiratory insufficiency can occur within a short time.

Many factors like infections, stress or psychological impairment can cause a change for the worse.

disorders, dry mouth, reduced transpiration and tear fluid, constipation and sexual impotence.

In about 60 % of cases LEMS appears as paraneoplastic syndrome, associating specifically with small-cell lung carcinoma (SCLC). In the remaining cases no carcinoma can be found even after long periods of observation.

LEMS is usually diagnosed prior to any clinical manifestation of the tumour. Typically the neurological symptoms may precede the radiological appearance of the cancer by 2 years and sometimes by 5 years or more. The diagnosis of LEMS can give the earliest clue to an underlying tumour.

Therefore, patients with LEMS should have repeated pulmonary check-ups. X-ray examinations of the chest are recommended every 3 months and a bronchoscopy every 6 months.

The Lambert-Eaton syndrome usually occurs after the age of 30 and is twice as common in men as in women. The disease is rare with children and adolescents.

The typical symptoms in LEMS are very similar to the generalized symptomes of myasthenia gravis (MG). Therefore, LEMS may initially be misdiagnosed as MG.

## Diagnosis

The most important different characteristics of the two diseases are shown in the following table:

|  | Myasthenia gravis | Lambert-Eaton Syndrome |
|---|---|---|
| **muscle strength** | decreasing during ongoing exercise | maximum contraction delayed |
| **ocular muscles paresis** | typical | rare |
| **autonomic nervous system** | normal | anti-cholinergic syndrome |
| **tendon reflexes** | normal | reduced with post-tetanic facilation |
| **single nerve stimulation** | normal amplitude | reduced amplitude |
| **repetitive stimulation** | decrement at 3-Hz stimulation | additional increment at 20-Hz stimulation |
| **acetylcholine receptor autoantibodies** | positive | negative |
| **calcium channel autoantibodies** | negative | positive |

http://www.dld-diagnostika.de/diseases/myasthenia-gravis/myasthenia-gravis_e.htm

4/20/2007

The history and physical findings are usually the most important initial clues to the diagnosis of MG. Confirmatory laboratory testing like the Tensilon® test, the 3-Hz repeated stimulation and the single-fiber electromyography are essential. Especially the measurement of circulating antibodies against acetylcholine receptors is of great importance for the differential diagnosis. The most common method is the immuno-precipitation test (ACHRAB® Assay).

Pathological concentrations of antibodies are detectable in about 90 to 95% of patients with generalized myasthenia gravis and in about 45% of patients with ocular MG. The absolute antibody concentration does not correlate with the severity of the disease, but in more than 90% of the patients there is a good individual correlation between the change of antibody concentration and clinical features. Therefore, the measurement of the antibodies is of great help in the therapeutic management and follow-up of myasthenia gravis. Above all it has been shown, that an increase of the autoantibodies can often be found several weeks before the onset of clinical deterioration. Consequently, the measurement of the antibodies enables a preventive therapeutic management.

For the diagnosis of the Lambert-Eaton syndrome methods like testing of the tendon reflexes and repetitive nerve stimulation can be used. In addition the radioimmunological measurement of antibodies against the voltage-gated calcium channels are of help. The use of P/Q-VGCCs, labelled $^{125}$I-ω-Conotoxin MVIIC results in a high sensitivity and specificity.

90% to 100% of patients with Lambert-Eaton syndrome and small-cell lung carcinoma are positive in the test. 80% to 90% of the patients with LEMS but without SCCL are found positive. There are only very few cases of normal healthy blood-donors and patients with other neurological disorders and autoimmune diseases like rheumatoid arthritis or SLE, who are found low positive in the test.

Like in myasthenia gravis, the absolute concentration of antibodies seems not to be correlated with the severity of the disease. But for the individual patient the increase or decrease of the concentration of antibodies may reflect the clinical course of the disease.

## Therapy

Anticholinesterase agents (Prostigmine, Pyridostigmine) are used as the first line of treatment for myasthenia gravis at all stages of severity and grades of the disease. They are the basis used for the focal disease, restricted to ocular muscles. Either surgical thymectomy or immunosuppressive treatment with corticosteroids and azathioprine is indicated for more severe generalized disorders. The single steps of treatment depend on the severity of the clinical symptomes.

After thymectomy, clinical remission occures in approximately 30 % of the patients (mainly at females) and improvement is seen in another 45 %. Plasma exchange produces short-term clinical improvement. It is used primarily to stabilize the condition of patients in myasthenic crisis or in patients who do not respond to other methods.

For a Lambert-Eaton syndrome associated with small-cell carcinoma of the lung, priority is given to the therapy of the tumour. The surgical removal of the tumour often causes a temporary improvement of the neurological symptomes. Immunosuppressive drugs are usually not indicated.

3,4-Diaminopyridine (possibly in combination with pyridostigmine) seems to be ideally suited for the symptomatic treatment of the Lambert-Eaton syndrome. It enhances the release of acetylcholine from the presynaptic nerve terminals. If there is no sufficient improvement, particularly in patients without tumour, an immunosuppressive therapy with prednisolone and/or azathioprine is indicated. In some cases even remissions have been reported. Plasmapheresis is an effective treatment for patients with severe symptoms.

## Literature

J. Newsom-Davis
**Diseases of the Neuromuscular Junction**
in: Diseases of the Nervous System. A.K. Asbury, G.M. McKhann, W.I. McDonald, Eds.
WB Saunders, Philadelphia 1992; 197-212

Myasthenia Gravis

R. Voltz, R. Hohlfeld, A. Fateh-Moghadam, T.N. Witt, C. Reimers, B. Siegele, H. Wekerle
**Myasthenia gravis: measurement of anti-AChR autoantibodies using cell line TE671**
Neurology 1991; 41: 1836-38

B. Stuhlmüller, J.R. Kalden, R. Fahlbusch, N. Hain, B. Manger
**Immunological and functional properties of acetylcholine receptor expressed on the human cell line TE671**
Eur. J. Clin. Chem. Clin. Biochem. 1993; 31: 657-665

P.F. Kennel, J.T. Vilquin, S. Braun, P. Fonteneau, J.M. Warter, P. Poindron
**Myasthenia gravis: comparative autoantibody assays using human muscle, TE671 and glucocorticoid-treated TE671 cells as sources of antigen**
Clin. Immunol. Immunopathol. 1995; 74: 293-296

M. Motomura, I. Johnston, B. Lang, A. Vincent, J. Newsom-Davis
**An improved diagnostic assay for Lambert-Eaton myasthenic syndrome**
J. Neurol. Neurosurg. Psychiatry 1995; 58: 85-87

V.A. Lennon, Th.J. Kryzer, G.E. Griesmann, P.E. O'Suilleabhain, A.J. Windebank, A. Woppmann, G.P. Miljanich, E.H. Lambert
**Calcium channel antibodies in the Lambert-Eaton syndrome and other paraneoplastic syndromes.**
N. Engl. J. Med. 1995; 332: 1467-1474

B. Lang, J. Newsom-Davis
**Immunopathology of the Lambert-Eaton myasthenic syndrome**
Springer Seminars in Immunopathology 1995;17:3-15 .

G.M. Elrington, N.M.F. Murray, S.G. Spiro, J. Newsom-Davis
**Neurological paraneoplastic syndromes in patients with small cell lung cancer. A prospective survey of 150 patients**
J. Neurol. Neurosurg. Psychiatry 1991;54:764-767

**Further literature upon request at contact@dld-diagnostika.de**